# EXHIBIT A

Troy P. Foster #017229
Haley Carr #035804
**The Foster Group, PLLC**
902 W. McDowell Road
Phoenix, Arizona 85007
Tel: 602-461-7990
tfoster@thefosterlaw.com
hcarr@thefosterlaw.com
*Attorneys for Plaintiff*

## IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Jason Mattie, an individual, | Case No.: **CV2021-016920** |
| Plaintiff, | **COMPLAINT** |
| vs. | **(Jury Trial Demanded)** |
| City of Goodyear, a municipal corporation, | |
| Defendant. | |

For his Complaint against the City of Goodyear ("Defendant," "Goodyear," or the "City"), Plaintiff Jason Mattie ("Plaintiff" or "Mattie") alleges as follows:

### PARTIES AND JURISDICTION

1.     Plaintiff Jason Mattie is an individual residing in Maricopa County, Arizona.

2.     Defendant City of Goodyear is a municipal corporation organized under the laws of the State of Arizona, and is located in Maricopa County, Arizona.

3.     The acts and omissions forming the basis of this Complaint occurred in Maricopa County, Arizona.

4.     Jurisdiction and venue are proper in this Court.

//

# GENERAL ALLEGATIONS

## Plaintiff's Employment History with the City

1. At all times relevant to this Complaint, Mattie was an employee of Defendant.

2. Mattie has been a law enforcement officer since 2005, when he first joined the Goodyear Police Department (the "Department").

3. After three years on patrol duty, Mattie became a Field Training Officer, training new police officers for the Department.

4. In 2010, Mattie was promoted to detective and assigned to a government drug task force.

5. In 2012, Mattie returned to Goodyear and became responsible for creating its first undercover narcotics unit, holding a position on the SWAT team and serving as a school resource officer.

6. In 2017, the City promoted Mattie to Sergeant and assigned him back to patrol.

7. After six months, Mattie was assigned to the Neighborhood Enforcement Team ("NET").

8. In his first three years on NET, Mattie and his team solved nearly every major violent crime in Goodyear.

9. NET worked on homicides, robberies, aggravated assaults, child crimes, and fugitive apprehension, among other things.

10. During the time Mattie worked on NET, the team closed over 90% of its cases—a statistic that is unheard of in law enforcement work.

11. In all his years of dedicated service and law enforcement work prior to the events underlying this Complaint, Mattie has never received a disciplinary action.

12. No citizen has ever filed a formal complaint against Mattie with Defendant.

13. Mattie received over 15 letters of accommodation during his employment with Defendant.

14. Mattie also supervised the last three officers that received Goodyear's "Officer of the Year" award.

15. Despite Mattie's record of dedicated public service, his career was precipitously derailed after he decided to do the right thing and provide the City with truthful information about his former boss and former Goodyear Police Chief Jerry Geier ("Geier").

## Geier Makes a Deal

16. Geier worked as the Goodyear Chief of Police in 2019 when the acts and omissions forming the basis of this Complaint began.

17. Justin Hughes ("Hughes") was a Deputy Chief in the Goodyear Police Department in 2019 when the acts and omissions underlying this Complaint began.

18. Santiago Rodriguez ("Rodriguez") was also a Deputy Chief in the Goodyear Police Department in 2019 when the acts and omissions underlying this Complaint began.

19. In 2019, Goodyear Police Officer Alison Braughton ("Braughton") was placed on administrative leave for numerous on- and off-duty incidents that violated department policy, including criminal activity.

20. Braughton was subjected to multiple internal investigations within the Department.

21. Before the investigations could conclude, Chief Geier made a deal with Braughton: If Braughton resigned from the Department, Geier would end the investigation and withhold any information about the investigation from interested parties, such as the Maricopa County Attorney's Office ("MCAO") and the Arizona Peace Officer Standards and Training Board ("AZPOST").

22. In August 2019, Hughes learned about Geier's deal and tried to convince Geier to make the report.

23. Geier refused to report Braughton.

24. When Geier refused to act, Hughes reported everything—including Geier's deal with Braughton—to the MCAO, AZPOST, and the Goodyear Human Resources

Department.

<u>**Mattie Is Interviewed as Part of the Investigation into Geier**</u>

25.     In October 2019, the Goodyear Police Officer's Association (the "Union") filed an ethics complaint against Geier due to his dealings with Braughton and his discriminatory hiring practices.

26.     Generally, the complaint alleged gender-based discrimination, preferential treatment for female employees, and unethical decision making.

27.     The ethics complaint mentioned that Hughes reported the incidents to MCAO, and it requested a thorough investigation of all the allegations against Geier.

28.     As part of the investigation into Geier, the City interviewed Mattie multiple times.

29.     During his interviews, Mattie provided information about Geier's misconduct and discriminatory treatment of employees.

30.     Eventually, as a result of Geier's misconduct, the City terminated Geier on December 20, 2019.

31.     Contrary to standard operating procedure in the Goodyear Police Department, Geier was not initially put on administrative leave while an investigation into the allegations of his misconduct was conducted.

32.     During the time he remained in charge, Geier began enacting his retaliation and revenge on those who he perceived as having wronged him—including Hughes and Mattie.

33.     Geier sought revenge on Mattie by lying to investigators about an April 2019 incident involving the NET team, Mattie, and then-Deputy Chief Hughes.

<u>**The April 2019 Incident Involving Hughes and Mattie**</u>

34.     On April 3, 2019, while on duty as a member of NET, Mattie received a call from an obviously upset Deputy Chief Hughes, who asked Mattie to pick him up.

35.     Mattie—unaware of why Hughes was upset and needed him to pick him up—called Internal Affairs Sergeant Jason Bayer ("Bayer") to let him know what was

going on and that he was going to pick Hughes up.

36.  When Mattie picked Hughes up, Hughes informed Mattie that he believed his wife, who was an FBI agent, had possibly been kidnapped and/or murdered.

37.  Mattie took Hughes to the Goodyear Police Administration building and tried to call Chief Geier and Deputy Chief Rodriguez to update them.

38.  When neither Geier nor Rodriguez answered, Mattie contacted Lieutenant Joe Pacello ("Pacello"), who gave Mattie permission to look for Hughes' wife.

39.  Eventually, Geier called Mattie back, and Mattie gave him an update.

40.  Sergeant Tizok Duque was present in Mattie's car when Mattie first spoke to Geier about the situation.

41.  Mattie spoke with Geier a second time in which he requested the assistance of the FBI and Phoenix PD; Geier told Mattie not to seek assistance.

42.  Fortunately, she was located shortly thereafter; and Mattie provided Geier with that update.

43.  The case was eventually turned over to Internal Affairs with Geier's approval.

**Mattie Is Subjected to Multiple Unwarranted Investigations and Interviews in the Following Months**

Mattie's First NOI – October 2019

44.  When Geier was eventually placed on administrative leave in October 2019, Mattie received a Notice of Interview ("NOI") related to Hughes asking NET to look for his wife six months prior.

45.  Mattie was interviewed three times about the incident.

46.  During his third interview, the interviewer read Mattie a quote by Geier that said Geier was disappointed by the decision of his supervisors to go after Hughes' wife without Geier's knowledge or authority.

47.  Geier's statement was a blatant lie.

48.  There were phone records and text messages demonstrating Geier's

knowledge of both the incident and NET's involvement in it.

49.    Mattie informed the interviewer that Geier was lying during an investigation.

50.    Geier made false statements to the City and its investigator that could jeopardize Mattie's career, but the City supported Geier and helped carry out his retaliation.

51.    Even after Geier's termination in December 2019, City officials—including Vice Mayor Bill Stipp ("Stipp") and Councilmember Wally Campbell ("Campbell")—voiced public support for Geier and condemned the alleged "coup" by a group of individuals that included Hughes and Mattie.

<u>Mattie's Second NOI – December 11, 2019</u>

52.    On December 11, 2019, the City served Mattie with an NOI concerning statements made by Officer Jonathan Martinez ("Martinez").

53.    Martinez made false statements to his sergeant about Mattie, suggesting Mattie was making disparaging remarks against another police team.

54.    Mattie reported these false statements to Deputy Chief Jeff Mercy ("Mercy").

55.    Mercy conducted an administrative inquiry into the matter.

56.    Martinez promptly resigned because of his dishonesty.

57.    Martinez's attorney then filed several complaints on Martinez's behalf against Mattie.

58.    Rodriguez sent an email to the Department announcing Martinez's resignation on December 12, 2019.

59.    Goodyear Human Resources rejected Martinez's resignation pending the outcome of a formal investigation into Mattie.

60.    Rodriguez sent out a second email on December 13, 2019, apologizing for any confusion and stating that Martinez had not resigned, that Martinez was on Paid Administrative Leave, and that Martinez was not allowed on property without an escort.

61. After a formal investigation, the City eventually cleared Mattie of all charges/allegations related to Martinez.

62. Martinez was Geier's next door neighbor when these events occurred.

63. Martinez's statements and the resulting claims occurred just before Mattie was scheduled to testify in Geier's appeal hearing.

64. Martinez's baseless complaints against Mattie were intended to discredit Mattie before Geier's appeal hearing.

Mattie's Second NOI – January 10, 2020

65. On January 10, 2020, Bayer sent Mattie another NOI, but this time the NOI listed Mattie as a "witness/principle."

66. The prior NOIs Mattie received had listed him as a "witness" only.

67. The NOI stated that the City was conducting an "inquiry concerning [Mattie's] conduct, and [Mattie's] knowledge and information about the conduct of Officer Jonathan Martinez in December 2019."

68. The NOI had no allegations listed, did not supply any supporting documents, and did not state the specific nature of the investigation.

69. Failure to include such information was a clear violation of Mattie's Peace Officer Bill of Rights. *See* A.R.S. § 38-1104(A)(2).

70. The City violated Mattie's Peace Officer Bill of Rights by designating him as ***both*** a witness and a subject employee.

71. The retaliation appeared to be from management and related to Geier.

72. Mattie also asked to speak to Human Resources, but everyone was gone for the day.

73. Bayer then sent an email to Lyman Locket ("Locket"), the City's HR Director, and Chief Rodriguez advising them that the Department was violating Mattie's Peace Officer Bill of Rights.

74. Union President Marcus Patterson ("Patterson") called Locket and told him that Mattie could not be served as both a principle and witness.

75. Locket responded by stating that Mattie could be served as both and that his interview would determine whether he was a witness or principle.

76. This was a clear violation of Mattie's Peace Officer Bill of Rights.

77. On January 13, 2020, Lieutenant Pacello emailed Locket his concerns about the City's process and the violation of Mattie's Peace Officer Bill of Rights.

Mattie's Third NOI – January 13, 2020

78. Later that same day, the City served Mattie with an amended NOI that was identical to the January 8th NOI *except* that it only listed him as a "witness."

79. However, the NOI still stated that allegations had been made against Mattie.

Mattie's Fourth and Fifth NOIs – January 15, 2020

80. On January 15, 2020, the City served Mattie with his Fourth NOI, which the City labeled a "Supplemental Notice of Interview."

81. This NOI listed Mattie as a "witness."

82. Despite being listed as a witness only, the NOI clearly stated at the top that it was being issued to provide Mattie with the allegations against him and all relevant documentation.

83. Once Mattie signed the Fourth NOI, the City served him with yet *another* NOI (also labelled a "Supplemental Notice of Interview").

84. This Fifth NOI listed Mattie as the "subject employee" and finally provided him with a list of the specific allegations Martinez made against him.

85. At this point, Mattie asked questions about the slew of NOIs he had received and their procedural deficiencies.

86. Human Resources notified Locket, who told Mattie that he had been served the fifth NOI in error.

87. The City eventually cleared Mattie on all allegations related to Martinez after an extensive third-party investigation.

88. Rodriguez subsequently terminated Martinez.

//

**The Department Offers Mattie No Help for Two Officer-Involved Shootings**

89.     On December 22, 2019—just two days after Geier's termination, Mattie was involved in an officer-involved shooting.

90.     While Mattie was trying to apprehend a suspect, the suspect shot at Mattie and other officers.

91.     Hours earlier, Mattie had requested SWAT team intervention because the suspect had told family members he was going to "shoot it out with the police."

92.     Rodriguez denied the request.

93.     After the shooting, Mattie asked Rodriguez to start an officer involved shooting investigation.

94.     Rodriguez again denied Mattie's request, stating that the Department did not have enough staff.

95.     Standard practice in law enforcement is for an outside agency to investigate an officer-involved shooting, making Rodriguez's claim nonsensical.

96.     On January 24, 2020—just one month later—Mattie was involved in a *second* officer-involved shooting.

97.     During this incident, Mattie was forced to use his vehicle to ram the suspects' vehicle in Queen Creek to prevent them from running down other officers.

98.     After dealing with this incident and the December shooting, Mattie began experiencing Post-Traumatic Stress Disorder ("PTSD").

99.     Mattie asked for time off to deal with his new symptoms, putting the request in with Deputy Chief Mercy.

100.     However, the Department was only willing to give Mattie one week of paid time off ("PTO") and would require him to use personal time for any time off beyond that.

101.     This was contrary to Department policy for traumatic events and the protections afforded under the Craig Tiger Act. *See* A.R.S. § 38-673.

102.     Neither Mercy nor any other City representatives discussed Mattie's rights under the Americans with Disabilities Act ("ADA") with him at that time.

**The City Cracks Down on NET and Unnecessarily Scrutinizes Mattie's Actions**

103.    After the January shooting, City Management and the City Council began to meticulously scrutinize Mattie, and the NET team generally.

104.    Lieutenant Greg Garner ("Garner"), Mattie's supervisor, was asked to submit an official memorandum to City management to explain the NET team's actions in Queen Creek.

105.    Such requests are extremely unusual and almost never happen.

106.    Members of the City Council were also regularly emailing Rodriguez asking for updates on the NET team during this time.

107.    In the summer of 2020, Lieutenant James Hernandez ("Hernandez") became the new supervisor of NET.

108.    Shortly thereafter, Hernandez sent Mattie an email detailing several areas they would need to discuss, including the perceived high number of use-of-force incidents on the NET team and the suggestion that other detective units did not want to work with NET.

109.    When Hernandez subsequently met with Mattie, Mattie provided him with statistics showing that NET was only involved in 4 use-of-force incidents during 167 apprehensions in 2½ years.

110.    Hernandez later apologized to Mattie after Hernandez conducted his own inquiry and determined he had been provided inaccurate information.

111.    Hernandez told Mattie that he was going to be honest with him and said that Mattie was not in the City's "good graces."

112.    Mattie complained to Hernandez, Mercy, and Rodriguez on multiple occasions the he believed he was being retaliated against by City Management.

113.    These City agents took no action in response.

**The City Refuses to Let NET Investigate Unless Mattie Withdraws from a Case**

114.    In July 2020, Mattie made several requests for himself and the NET team to travel to Chicago to investigate and solve a murder.

115. Mattie had clear evidence of who committed the murder and knew the location of the two suspects.

116. The Department refused to send Mattie and/or the NET team.

117. It was not until October 2020—four months after the murder—that Mattie was able to convince the Department to send the NET team to Chicago.

118. The only way Mattie could get the Department to agree to send the NET team to Chicago was if Mattie agreed that he would not go.

**The City Refuses to Transfer Mattie Despite His Requests for a Transfer to a Less Triggering Unit**

119. By August 2020, Mattie was dealing with a significant amount of stress due to the pressure from the Department, City Management, and City Council—as well as fear of the City's retaliation, and his involvement in two officer-involved shootings.

120. Around that time, Mattie asked Lieutenant Pacello whether the Department could place Mattie in hiring and recruitment so he could avoid the stress associated with the work his unit performed.

121. Mattie also spoke to Union President Patterson about a transfer at this time.

122. Both Patterson and Pacello spoke to Chief Rodriguez about transferring Mattie to an environment that would be less harmful to his well-being and recovery.

123. Rodriguez's response was to change the name of the NET team and shift its focus to narcotics.

124. Mattie's transfer request was dismissed.

125. Later that same month, Lieutenant Hernandez told Mattie that the Department was transferring him to Property Crimes.

126. Mattie was initially reluctant to joint Property Crimes.

127. However, the next day Mattie submitted a formal memorandum requesting the transfer to Property Crimes because of the severe stress he was under.

128. Hernandez agreed Property Crimes would be a better place for Mattie to decompress.

129. Hernandez sent a Department wide email stating Mattie would be transferred to Property Crimes.

130. The email did not include a date for the transfer.

131. The Department did not provide Mattie with an effective date for the transfer.

**Mattie Is Involved in a Third Traumatic Gun Incident**

132. By October 12, 2020, Mattie was still on the NET team, where he was exposed to high stress situations—including a third gun incident.

133. That day, Mattie was involved in trying to apprehend a suspect who had been involved in a police officer chase earlier in the day.

134. Mattie contacted Deputy Chief Mercy to update him on the events.

135. When Mattie explained that he planned to apprehend the suspect, Mercy stated "don't get into a shooting."

136. Knowing that a shooting is ultimately dictated by the suspect, Mattie turned the tactical decisions over to a SWAT supervisor.

137. The SWAT team made and attempted to execute a plan, but the suspect escaped in his car.

138. The suspect then struck a police car, which is an aggravated assault, before his car was stopped and the suspect fled on foot.

139. Mattie chased after the suspect to protect potential innocent victims and was able to take the suspect into custody.

140. After the chase, Chief Rodriguez ordered Internal Affairs to go out to the scene to question Mattie.

141. The City never issued Mattie a NOI, but he gave a statement and was subjected to an Internal Affairs interview.

142. This was another clear violation of Mattie's Peace Officer Bill of Rights.

143. When Mattie chased the suspect that day, he did not realize the suspect had a gun. After learning about the gun, Mattie spent the next 24 hours dealing with the shock.

144.    He was not sure whether his lack of sleep and stress had caused him to miss the gun.

145.    He also dealt with the realization that at any moment during the chase he could have lost his life.

146.    As a husband and father to two children, this was particularly upsetting to Mattie.

147.    Moreover, the Internal Affairs investigation caused Mattie to fear that he would lose his job and the career he was building because the City was looking for any misstep.

148.    This only added to Mattie's anxiety and tension from living under the City's microscope.

149.    The next day, Mattie saw a Nurse Practitioner for a shoulder injury.

150.    The Nurse Practitioner noted that Mattie looked visibly unwell and asked him what was going on.

151.    Mattie told her that he wasn't sleeping and was having a difficult time dealing with some shootings over the last year.

152.    The Nurse Practitioner instructed Mattie to take three months off to take care of himself and "get his head right."

153.    Later that afternoon, Mattie met with Chief Rodriguez, Lieutenant Hernandez, and Deputy Chief Mercy regarding the homicide investigation that required travel to Chicago.

154.    When that meeting ended, Mattie asked Hernandez and Mercy to let Mattie and Rodriguez speak alone.

155.    When Mattie was alone with Chief Rodriguez, Mattie presented Rodriguez with his leave slip.

156.    Mattie told Rodriguez that he would be taking leave and that he would not be returning to the NET team when he came back.

157.   HR instructed Mattie that his leave would be classified as administrative leave.

158.   No one mentioned the Craig Tiger Act to Mattie at this time.

159.   Mattie saw the Nurse Practitioner again the following month in November.

160.   She informed him that HR Director Locket had contacted her boss directly to voice his concerns about the amount of time she had recommended Mattie take off to deal with his PTSD.

161.   Apparently, Locket believed 12 weeks was too long.

162.   Locket had no right to question Mattie's recommended medical treatment.

163.   Mattie's Nurse Practitioner agreed that Locket had overstepped.

164.   Locket attempted to interfere with Mattie's leave out of retaliation.

### The City Continues to Interfere with Mattie's Leave

165.   On October 16, 2020, Deputy Chief Mercy sent Mattie a text stating that Mattie's timesheet would be changed to state that he was on sick leave because FMLA is sick leave, not administrative leave.

166.   That was contrary to what HR told Mattie.

167.   This was the only time the City mentioned FMLA to Mattie until December 17, 2020.

168.   The City did not mention the Craig Tiger Act to Mattie until December 17, 2020.

169.   On November 4, 2020, Mattie scheduled a meeting with Jeanni Ruddy ("Ruddy") (HR representative) for November 6, 2020.

170.   Soon after and seemingly unprompted, Lieutenant Hernandez called Mattie to ask how he was doing – even though Hernandez was no longer Mattie's supervisor at this point.

171.   Later that night, Hernandez sent the new NET team supervisor, Sergeant Frankie Grijalva, and Lieutenant Benson (Mattie's direct supervisor at the time) an email

stating that Hernandez was looking into the October 12th incident and that he may have discovered some policy violations.

172. Benson told Mattie it was a dead issue and that no one was looking to those false allegations.

173. On November 6, 2020, Mattie met with Ruddy and submitted his medical retirement paperwork.

174. During their meeting, Mattie asked Ruddy who would read his medical retirement paperwork.

175. Ruddy assured Mattie no one in HR would review the documents and even told Mattie that she would seal the documents before submitting them.

176. On November 8, 2020, Mattie met with Chief Rodriguez to explain why he submitted his medical retirement paperwork.

177. Mattie informed Rodriguez he was dealing with PTSD, loss of sleep, and nightmares – all due to the City's actions and the stress of his job.

178. Mattie also explained to Rodriguez that he felt like he had a target on his back due to the Geier investigation and that Mattie could feel pressure from the City.

179. Rodriguez told Mattie that he needed to do what he had to do to protect his pension.

180. On December 10, 2020, the Retirement Board tabled a vote to send Mattie to an Independent Medical Examiner ("IME") and requested more documents.

181. At that time, Mattie asked his supervisors how much leave the City would provide him with.

182. Rodriguez told Mattie that under Department policy and the Craig Tiger Act, Mattie would receive 90 days of leave because he had three separate traumatic incidents in the last year that would qualify under the Craig Tiger Act.

183. On December 17, 2020, Mattie was still out of work under the Craig Tiger Act.

184. On that day, HR Director Locket instructed Mattie to go on FMLA leave.

185. Mattie's doctor filled out FMLA paperwork and submitted it to the Department.

186. Within three hours, when Mattie tried to check his work email, he received a notification that the administrator locked his Department email.

187. At that time the Department did not, as a regular practice, lock employees out of their work email when they were on FMLA leave.

188. As of April 2021, four months after Mattie was locked out of his work email, two other officers who were out on FMLA leave still had access to their email despite being on leave for work-related injuries.

189. The City forced Mattie to take FMLA leave so that it could use his FMLA leave as an excuse to terminate his access to his work email.

190. The City did not, as a regular practice, force employees with serious work-related injuries to take FMLA leave.

191. The City forced Mattie to take FMLA leave out of retaliation for providing testimony against Chief Geier.

192. Between December 17, 2020 and March 2021, Mattie was shut off from the City and forced to use his personal email for all communications with the City.

**The City Denies Mattie Resources He is Entitled to by Statute and Delays His Retirement**

193. On January 8, 2021, an HR representative, Shealyn Becker ("Becker") called Mattie to discuss his leave status and treatment options.

194. Mattie could tell the call was on speaker phone. When he asked Becker about it, she took him off speaker phone.

195. Mattie later learned that Becker was working out of Chief Rodriguez's conference room that day – suggesting Rodriguez and others were present to listen in on this confidential phone call.

196. Mattie explained to Becker that he was unable to return to work due to his PTSD symptoms and because no additional treatment options were made available to him.

197. Although the Craig Tiger Act requires the City to provide employees assistance after experiencing traumatic events, Mattie was left to fend for himself and find his own treatment.

198. A couple months later, on March 4, 2021, at a meeting where Ruddy and Locket were present, the Retirement Board offered Mattie two options: (1) take a year of medical retirement, then reevaluate his options; or (2) the Retirement Board would table its vote on Mattie's retirement, and Mattie would stay out of work to get treatment.

199. On March 15, 2021, Mattie told Ruddy he was taking the second option and wanted that option presented in writing.

200. Ruddy then told Mattie that his 180 days of leave would expire soon.

201. Mattie explained to Ruddy that he had both work-related leave and Craig Tiger Act leave, so his leave should not be expiring soon.

202. Mattie was never advised during the March 4th meeting that there was a deadline on him getting necessary treatment.

203. On March 15, 2021, Mattie had another meeting with Locket, Ruddy, Guillermo "Willy" Elizondo ("Elizondo") (another HR representative), Bayer (acting as Mattie's representative), Deputy Chief Mercy, and Lieutenant Benson (Mattie's then-supervisor).

204. During that meeting, Ruddy and Locket explained that Mattie could either (1) return to work in 33 days (which was 180 days after Mattie initially took leave); (2) accept a light duty position outside the Department; or (3) could be terminated for taking more time than allowed.

205. Bayer explained to Locket how none of these options were discussed during the March 4th meeting and how the Retirement Board never set a deadline for Mattie to get treatment.

206. These options are contrary to the Craig Tiger Act, which forbids an employer from requiring an officer who is receiving treatment to use that officer's paid vacation, personal leave, or sick leave while participating in treatment.

207. Mattie, rightfully believing he had the opportunity to seek treatment, had just started an 8-week intensive outpatient therapy program that would not conclude within the 33-day deadline set by Locket.

208. Mattie pleaded with HR and DC Mercy to allow him to finish the 8-week program which he was told that they would not extend the 180 day policy for him leaving him to fear being fired if he did not return to work by the 180th day.

209. Mattie's pleas were ignored.

### Mattie's Medical Retirement

210. Because the City refused to offer Mattie extended leave or additional resources to deal with his PTSD when he was entitled to such leave and treatment under the law, he was forced to follow through with his medical retirement.

211. On March 31, 2021, Mattie's doctor filled out ADA paperwork certifying that Mattie could no longer return to work as a police officer because his PTSD had gotten too severe.

212. Mattie's doctor stated in the ADA paperwork: "I recommend that [Mattie] medically retire from this job as the PTSD incurred as part of his job duties have rendered him incapable of being a police officer. This is a permanent disability."

213. Mattie's last day of employment was on or around May 29, 2021.

214. Mattie's medical retirement was processed and effective July 9, 2021.

215. Mattie received no pay between his last date of employment and the first date of his medical retirement.

### LEGAL CLAIMS[1]

### Count One – Wrongful Discharge (A.R.S. § 23-1501)

216. Plaintiff incorporates all the foregoing Paragraphs as if fully set forth herein.

217. Mattie had information and a reasonable belief that the City had violated the

---

[1] Plaintiff has filed Charge of Discrimination against Defendant with the EEOC alleging violations of the Americans with Disabilities Act and retaliation under Title VII of the Civil Rights Act. Plaintiff anticipates amending this Complaint to add these additional federal claims as soon as he receives his Right to Sue from the EEOC.

Craig Tiger Act by failing to provide him with the leave required under A.R.S. § 38-673.

218. Mattie had information and a reasonable belief that the City had violated his Peace Officer Bill of Rights by failing to provide him with the notice and protections required under A.R.S. § 38-1104 on multiple occasions.

219. Mattie disclosed this information and these beliefs to Deputy Chief Mercy, Human Resources Director Lyman Locket, and numerous other City officials who had the authority to investigate the information and take action to prevent further violations of Arizona law.

220. The City failed to investigate Mattie's claims and continued to deprive him of the treatment, leave, and notice he was entitled to under the relevant statutes.

221. This meant Mattie was forced to continue working in an environment that was extremely detrimental to his health.

222. Any reasonable employee in Mattie's position would have felt compelled to resign/retire to protect their own mental health.

223. Mattie was constructively discharged by objectively difficult working conditions and the outrageous conduct of Goodyear's agents through a continuous pattern of discriminatory harassment.

224. Because of Goodyear's conduct, Mattie was ultimately forced to file for disability retirement.

225. As the direct result of the City's conduct, Mattie suffered and will continue to suffer substantial harm, including but not limited to the loss of any advancement in a career he diligently pursued for over 16 years.

226. Plaintiff is entitled to back pay, compensatory damages, punitive damages, and attorneys' fees and costs.

**Count Two – Intentional Infliction of Emotional Distress**

227. Plaintiff incorporates all the foregoing Paragraphs as if fully set forth herein.

228. Goodyear's conduct toward Mattie, as alleged above, was extreme and outrageous.

229. Goodyear's conduct toward Mattie was intentional or reckless.

230. Goodyear's conduct intended to cause emotional distress, or Goodyear's agents recklessly disregarded the near certainty that distress would result from their conduct.

231. Goodyear's conduct actually caused Mattie to suffer severe emotional distress.

232. The acts taken toward Mattie were carried out by Goodyear and/or its officers, directors, and/or managing agents acting in a despicable, oppressive, fraudulent, malicious, deliberate, egregious, and/or inexcusable manner, and in reckless disregard for the rights and safety of Mattie.

233. Plaintiff is entitled to compensatory damages and punitive damages in a sum appropriate to punish and make an example of Goodyear.

### Count Three – FMLA Interference (29 U.S.C. § 2615)

234. Plaintiff incorporates all the foregoing Paragraphs as if fully set forth herein.

235. Goodyear is a covered employer under 29 U.S.C. § 2611(4).

236. By 2019, Mattie had been employed with the Defendant for more than one year.

237. By the time of the second officer-involved shooting in January 2020, Mattie had worked more than 1250 hours in the previous year.

238. After the second shooting, Mattie requested time off to deal with his PTSD symptoms.

239. By the second shooting incident in January 2020, Mattie's PTSD was a serious medical condition.

240. As such, Mattie was a qualified employee under 29 U.S.C. § 2611(2).

241. Defendant interfered with and denied Plaintiff's right to take statutorily protected leave under the FMLA.

242. First, HR Director Locket attempted to prevent Mattie from taking the full amount of leave recommended by his Nurse Practitioner.

243. Then, the City forced Mattie to take FMLA leave in December 2019 despite not having a policy or practice of requiring other officers with serious work-related injuries to take FMLA.

244. Because Mattie was forced to use FMLA leave in late 2020, he had no remaining leave available to use in April 2021 when he needed to finish his 8-week outpatient treatment program.

245. Thus, Mattie was forced to medically retire.

246. Defendant's actions were intentional.

247. Defendant's actions damaged Plaintiff.

248. Plaintiff is entitled to back pay, front pay, consequential damages, liquidated damages, and attorneys' fees and costs.

## **Count Four – FMLA Retaliation (29 U.S.C. § 2615)**

249. Plaintiff incorporates all of the foregoing Paragraphs as if full set forth herein.

250. As soon as Plaintiff raised concerns about the way Defendant handled his leave requests in late 2020, Defendant escalated its retaliatory behavior against Plaintiff by denying him Craig Tiger Act leave and other protections required under Arizona law.

251. Defendant's retaliatory conduct directly resulted in Plaintiff's forced medical retirement.

252. Defendant's actions were intentional.

253. Defendant's unlawful actions damaged Plaintiff.

254. Plaintiff is entitled to back pay, front pay, consequential damages, liquidated damages, and attorneys' fees and costs.

### **CONCLUSION**

**THEREFORE**, Plaintiff respectfully requests the following relief:

A. A judgment in his favor against the Defendant;

B. An award of back pay, front pay, and compensatory damages;

C. Liquidated and punitive damages;

D.  Pre- and post-judgment interest on award;

E.  Reasonable attorneys' fees and costs; and

F.  All other appropriate equitable relief.


**DATED** this 29th day of October, 2021.

                              **The Foster Group**

                               /s/  Troy P. Foster
                              Troy P. Foster
                              Haley Carr
                              902 W. McDowell Road
                              Phoenix, Arizona 85007
                              *Counsel for Plaintiff*

# In the Superior Court of the State of Arizona
# In and For the County of Maricopa

**Plaintiff's Attorneys:**

Troy P Foster - Primary Attorney
Bar Number: 017229, issuing State: AZ
Law Firm: The Foster Group, PLLC
902 W Mcdowell Rd
Phoenix, AZ 85007
Telephone Number: (602)461-7990
Email address: tfoster@thefosterlaw.com

Haley R. Carr
Bar Number: 05804, issuing State: AZ
Law Firm: The Foster Group, PLLC
Telephone Number: (602)461-7990

**Plaintiff:**

Jason Mattie

**Defendant:**

City of Goodyear, a municipal corporation

Discovery Tier t3

Case Category: Other Civil Case Categories
Case Subcategory: Employment Dispute - Other

Justin S. Pierce (State Bar #022646)
**PIERCE COLEMAN PLLC**
7730 East Greenway Road, Suite 105
Scottsdale, Arizona 85260
(602) 772-5507
Justin@PierceColeman.com
*Attorney for Defendants*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN THE COUNTY OF MARICOPA**

| | |
|---|---|
| Jason Mattie, an individual, | Case No.: CV2021-016920 |
| Plaintiff, | |
| vs. | **WAIVER OF SERVICE** |
| City of Goodyear, a municipal corporation, | |
| Defendants. | |

ACKNOWLEDGMENT OF WAIVER OF SERVICE.  I, Justin S. Pierce of Pierce Coleman PLLC, on behalf of City of Goodyear, acknowledge receipt of your request that the City of Goodyear waive service of a summons with respect to the above-referenced action.

I or the Defendants also have received a copy of the Complaint and Certificate of Compulsory Arbitration in the action, two copies of this Waiver of Service, and a means by which the signed waiver can be returned to you without cost to me.

I or the Defendants agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that the entity on whose behalf I am acting be served with judicial process in the manner provided by the Arizona Rules of Civil Procedure.

1

The City of Goodyear will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons. Nothing in this Waiver of Service impedes my client's right to remove this action to federal court, if appropriate and desired.

DEFAULT JUDGMENT. I understand that a judgment may be entered against City of Goodyear, if an answer or motion under Rule 12 is not served upon you within sixty (60) days after this waiver was sent, which was November 9, 2021.

**I swear or affirm under penalty of perjury that the contents of this waiver are true and correct to the best of my knowledge and belief.**

**DATED** this 22nd day of November, 2021.

PIERCE COLEMAN PLLC

By    /s/ Justin S. Pierce
        Justin S. Pierce
        *Attorney for Defendants*

Original of the foregoing efiled via TurboCourt
and emailed this 22nd day of November, 2021, to:

Troy P. Foster
Haley Carr
THE FOSTER GROUP, PLLC
902 West McDowell Road
Phoenix, Arizona  85007
tfoster@thefosterlaw.com
hcarr@thefosterlaw.com
Attorneys for Plaintiff

*/s/ Christina Youngberg*